UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
───────────────────────────────────────────

**SHOP VAC CORPORATION and**
**FELCHAR MANUFACTURING CORPORATION,**

                                          **Plaintiffs,**

-against-                                                                                            04-CV-262

**BCL MAGNETICS LTD.,**

                                          **Defendant.**
───────────────────────────────────────────

**THOMAS J. McAVOY,**
**Senior United States District Judge**

## DECISION & ORDER

### I. INTRODUCTION

Plaintiffs Shop Vac Corporation ("Shop Vac") and Felchar Manufacturing Corporation ("Felchar") commenced this action under the Court's diversity jurisdiction asserting claims sounding in common law breach of contract, breach of express and implied warranties, and negligence. Defendant BCL Magnetics, Ltd. ("BCL") moves for summary judgment pursuant to FED. R. CIV. P. 56 asserting that some or all of Plaintiffs' claims and sought-after damages should be dismissed. Plaintiffs have opposed the motion. For the reasons that follow, the motion is granted in part and denied in part.

### II. STANDARD OF REVIEW

The Court will apply the well settled standard for summary judgment as defined by statute,

see FED. R. CIV. P. 56(c), case law, Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and this Court's Local Rules. See N.D.N.Y.L.R. 7.1.

### III.  APPLICABLE LAW

The Court finds, and the parties agree, that New York substantive law applies to all claims in this case. See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427 (1996); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Meyers V. Epstein, 232 F. Supp.2d 192, 195 (S.D.N.Y. 2002); Coastal Aviation, Inc. v. Commander Aircraft Co., 937 F. Supp. 1051 (S.D.N.Y. 1996); Def. Mem. L., pp. 6-7; Pl. Mem. L. p. 10, fn. 2.

### IV.  FACTUAL BACKGROUND

On a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant, and must draw all reasonable inferences from the established facts in the non-movant's favor. Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002). Doing so on this motion reveals the following material facts.

Felchar manufactures electric motors used in vacuum cleaners sold by its parent corporation, Shop Vac. Since the early 1980's, Felchar has manufactured two types of motors for this purpose - "E" and "K" frame motors. Out of the approximately 66 million electric motors that Felchar has manufactured, approximately 6 million have been the "K" frame motors that are at issue in this case.

Also since the early 1980's, Felchar repeatedly purchased steel from BCL for making the motor laminations used in the "E" and "K" frame motors.[1]  Plaintiffs contend that:

---

[1] Laminations are thin, circular pieces of steel, stamped into two shapes and used in electric motors. When bonded together and placed on a shaft, rotor-shaped laminations (such as those at issue here) form the heart of the rotating portion of a motor, known as an armature, while stator-shaped laminations form the portion of the motor in

(continued...)

> [o]ver the years, BCL personnel have gained a thorough understanding of Plaintiffs' business and their products by attending numerous meetings at Plaintiffs' facilities and detailed discussions concerning the specific characteristics needed for steel used in Felchar motors and laminations. Pl. St. ¶¶ 35-41. BCL was particularly aware that steel used to make laminations for Felchar's "E" frame motors was not suitable for making "K" frame motor laminations. Pl. St. ¶ 40. In particular, BCL employees had made written notes in their trip logs as far back as June 1998 that while BCL's 3027D-grade steel worked in "E" frame motors, it caused many of the "K" frame motors to run "too hot." Pl. St. ¶¶ 41, 47; Ex. 4 (memorandum from BCL's Mike Sinclair describing June 17, 1998 visit to Felchar). BCL employees also took note of Felchar's concerns regarding "peak permeability," an electromagnetic property of steel that measures the relative ease with which a material will accept a magnetic field. Pl. St. ¶¶ 52, 65; Ex. 4; Declaration of Felchar Project Engineer Neil Norell sworn to July 5, 2005 ("Norell Dec.") ¶¶ 5, 12, 15. In numerous meetings with BCL personnel, Felchar discussed the peak permeability of lamination steel as a critical factor in the performance of "K" motors. Id. The alloy content of BCL's steel, including the percentage of silicon, was also discussed. Ex. 4. The alloy content of steel can affect the steel's peak permeability and the amount of heat generated by the steel during operation of electric motors. Pl. St. ¶¶ 66-68; Declaration of Dr. Thomas G. Habetler sworn to June 28, 2005 ("Habetler Dec.") ¶¶ 6-7.
>
> Felchar had approved and purchased BCL grade 3025D steel for its "E" frame motor laminations but the only BCL steel Felchar ever approved and purchased for use in its "K" motors was grade 1525D steel, which had a significantly different alloy composition and electromagnetic properties than other BCL steels Felchar purchased for other motor laminations. Pl. St. ¶¶ 43-44, 49-50.

Pl. Mem. L. pp 3-4.

In late 2002 and early 2003, Felchar determined to purchase rotor laminations from BCL for Felchar's "K" motors. Tom Holmes ("Holmes") of Felchar contacted BCL and specifically said, among other things, that laminations were needed for Felchar's "K" motors and they should be made from "the 'K' material" BCL had previously sold Felchar. Pl. St. ¶¶ 55-56. Representatives of the two companies then engaged in a series of communications, including exchanging various documents, pursuant to the ordering process for these laminations.

---

[1](...continued)
which the armature rotates.

3

One of the "critical documents," at least according to the Plaintiffs, was a "part print" for the laminations, designated on the print by their Felchar part number, 12637-11. Ex. 8 (April 24, 2003 letter from Tom Holmes to BCL enclosing the part print). Felchar forwarded a copy of the "Revision U" part print for the laminations to BCL in April 2003. Id. The print listed specifications for, *inter alia*, electromagnetic properties of the steel, such as peak permeability and core loss, as well as other information. Id.; Pl. St. ¶ 60. The print confirmed an earlier purchase form for 2.5 million "'K' rotor laminations" made according to the "Rev[ision] U" specifications. Pl. St. ¶ 57; Ex. 9 (Felchar preliminary purchase order dated April 17, 2003).

Holmes discussed each of the specifications for the laminations with BCL. Pl. St. ¶ 61. BCL never questioned, objected to or asked to change any of the specifications. Pl. St. ¶ 63. Plaintiff contends that

> [a]s a member of the International Standards Organization ("ISO") BCL knew, however, that a customer's specifications could not simply be ignored. Pl. St. ¶ 71. BCL's ISO certification requires it to follow detailed quality control procedures, set forth in its manual, for insuring that orders are properly manufactured to the supplied specifications. Pl. St. ¶¶ 70-72. Under these procedures, BCL had to follow all of a customer's specifications or affirmatively seek the permission of the customer to deviate from them. Pl. St. ¶¶ 74-75; Ex. 10 (excerpts from BCL's ISO procedures manual). Felchar thus expected that all of its specifications would be met. Norell Dec. ¶ 15. One of the specifications on the print was a peak permeability specification of 1200. Pl. St. ¶ 64.

Pl. Mem L. p. 5.[2]

---

[2] Defendant argues:

> Though not determinative on this motion, it is BCL's position that the "peak permeability" value of 1200 contained on the print was not a specification. Dr. Habetler testified that he defined "peak permeability" as the maximum value of permeability (Exhibit. P, p. 16, Leonard Affd.). However, The 2004 Annual Book of Standards, Section Three, Metals Test Methods and Analytical Procedures, Vol. 03.04/Magnetic Properties lists the following definition:
>
> > Permeability, ac, magnetic – a generic term used to represent a dynamic material

(continued...)

4

Because BCL had not previously made the exact part described by Felchar's print, BCL implemented its "part print review" procedure, described in its ISO manual, which required BCL to determine whether it could manufacture the part to Felchar's specifications. Pl. St. ¶¶ 70-75; Ex. 10. BCL Materials Engineer Tony DiBiase ("DiBiase") conducted the part print review for materials specifications issues but he never contacted anyone at Shop Vac or Felchar to ask any questions or raise any issues about the peak permeability specification. Instead, DiBiase selected the steel used to make the laminations without question or comment. Pl. St. ¶¶ 80-81, 85, 91. However, Plaintiffs contend,

> despite the fact that BCL had long known that only 1525D steel had been approved for use in Felchar's "K" motors, that Felchar had experienced heat problems when steel approved for "E" motors had been used in "K" motors, and that 3025D steel, a grade substantially similar to the BCL 3027D steel, had expressly been disapproved for "K" motors, DiBiase selected 3025D as the steel grade out of which the Laminations were to be made. Pl. St.¶ 81. Had he consulted the mill specifications from the steel manufacturer, Dofasco, Inc. ("Dofasco"), which were available to him on the Internet, he would have learned that the coils of the steel BCL actually used to make the Laminations had peak permeabilities of between 1600 and 1800 and 10 to 30 times less silicon – a critical element for lowering peak permeability – than the 1525D "K" steel that Felchar had previously purchased. Ex. 11 (Dofasco mill specifications); Pl. St. ¶¶ 83-84.
>
> Instead, DiBiase ignored the mill specifications and selected a steel with a peak permeability that far exceeded the 1200 specified. Pl. St. ¶ 84. DiBiase additionally

---

[2](...continued)
> property. It is expressed as the ratio of the magnetic induction, $B$, to the magnetic field strength, $H$, that produced the induction. The value of $H$ may be calculated from several different component values of the exciting current.
>
> Note 71 – The numerical value of any permeability is meaningless unless the corresponding $B$ or $H$ excitation level is specified. For incremental permeabilities not only the corresponding dc $B$ or $H$ excitation level must be specified, but also the dynamic excursion limits of the dynamic excitation range.

In the present case, there was [no] value of $B$ or $H$ listed on the print for permeability and, according to the ASTM, the numeric value listed was meaningless.

Def. Mem. L. pp. 5-6.

5

failed to notify Felchar of his steel selection or his deviation from the specification. Pl. St. ¶¶ 85, 91.

Pl. Mem L. pp. 6-7.

Having received no questions or comments on its specifications, Felchar sent BCL the final purchase order for the laminations on May 20, 2003. Pl. St. ¶ 86. The purchase order, that was signed only by Holmes from Felchar, did not set forth the specifications for the laminations on its face, although it did reference part print 12637-11, Rev. V.[3] Pl. St. ¶¶ 87-88; Pl. ex. 13.[4] Paragraph 4 of the Terms and Conditions of the purchase order stated:

> This writing contains the entire agreement between parties. Buyer is not responsible or liable for any agreement, conditions, or stipulations not specifically set forth herein relating to or affecting this purchase.

Pl. St. ¶ 3, ex. 13.

BCL shipped the laminations on May 30 and June 2, 2003.[5] The laminations were used in "K" motors, the vast majority of which were then incorporated into approximately 32,000 finished Shop Vac vacuum cleaners that were delivered to Plaintiffs' customers. Pl. St. ¶¶ 93-94. By August 2003, a large number of Shop Vac vacuum cleaners with "K" frame motors failed during routine testing after an unusually short time. Pl. St. ¶ 95. The failed motors had inordinately high

---

[3] The part print appears to have had several revisions. Although Plaintiffs refer to revision "U" (dated 4/22/03) as having been sent by Felchar to BCL, the purchase order refers to part print 1263711, rev. code "V." Plaintiff's exhibit 13 indicates that Revision V is dated 4/25/03. It is unclear what revision occurred between "U" and "V," but none of the parties have indicated that there were changes that are material to the instant motion. Further, Plaintiffs have admitted that the rotor laminations were to be manufactured pursuant to "part print specification 12637-XX (Revision V)." Pl. St. ¶ 2.

[4] Plaintiffs also contend that the purchase order stated that any deviations from the print "must be approved before manufacturing." While this may be accurate, none of the copies of the purchase order (including the enlarged portion of the bottom of the purchase order) are legible enough for the Court to confirm that this language appears on the purchase order.

[5] Plaintiffs contend that BCL did not complete its part print review process on the order until June 16, 2003 – two weeks after the laminations had been delivered. Pl. St. ¶¶ 89-90.

temperatures leading to short circuiting from the breakdown of insulation on magnet wires in the motors. Pl. St. ¶ 96.

To determine the cause of the failures, Plaintiffs began a testing process based on visual inspections, internal testing of temperatures and operating "life" of units, and testing by outside laboratories to determine the electromagnetic and chemical properties of the laminations. Pl. St. ¶¶ 97-104.[6] All of the failed motors contained BCL-stamped laminations while all of the motors that performed normally during the testing process contained Felchar-stamped rotors. Pl. St. ¶¶ 97-99. None of the failed motors contained Felchar-stamped rotors. Pl. St. ¶ 99. Testing and analysis by Plaintiffs' engineers also confirmed that there were no other functional differences between failed and normal-performing motors other than the presence or absence of BCL laminations. Pl. St. ¶ 100. Plaintiff's expert, Dr. Thomas Habetler, opines that "the direct consequence of BCL's failure to meet Felchar's peak permeability specification was to deliver motor laminations made from steel that caused the subject motors to overheat as described." Habetler Dec. ¶ 3.

Starting in August 2003, Plaintiffs undertook efforts to minimize the damages they faced from the failures. Plaintiffs traced the problem to the BCL laminations, and then identified vacuum cleaners built with BCL laminations and retrofitted affected units with motors made with non-BCL laminations. Pl. St. ¶¶ 97-104, 111. Plaintiffs also notified BCL of the motor failures and recalled all potentially-affected vacuums from their largest customer, Lowe's, to which the majority of "K" frame motors built during the relevant time had been shipped. Pl. St. ¶¶ 112-113. All recalled vacuums, as well as vacuum cleaners not yet shipped, were inspected, and where necessary, repaired, then re-packaged and re-shipped to Lowe's or shipped to other customers. Pl. St. ¶¶ 113-

---

[6] Plaintiffs assert that Felchar does not have the internal capability to verify peak permeability, core loss or alloy content of steel or steel parts purchased from outside suppliers. Pl. St. ¶ 92.

7

114. Plaintiffs also inspected all "K" frame motors and vacuum cleaners containing "K" frame motors in their facilities, including units in various stages of completion, and, where necessary, repaired and repackaged the affected units at their facilities. Pl. St. ¶ 114. Plaintiffs bore the costs for these efforts. Pl. St. ¶ 115.

This action and the instant motion followed.

## V.  DISCUSSION

### A.  Breach of Implied Warranty

Defendant first argues that Plaintiffs' claim for breach of implied warranty must be dismissed because Felchar, the buyer, gave BCL precise specifications for the laminations and did not rely upon Defendant to exercise its discretion or expertise in fulfilling the order for the laminations. In this regard, Defendant asserts:

> Breach of implied warranty is based upon a theory that a buyer relies upon the expertise of the seller to provide a product that is fit for its intended purpose. New York law is clear that when a buyer designs and provides specifications for the manufacture of a product, no implied warranty of merchantability arises because there can be no claim of reliance.

Def. Mem. L. p. 7 (citing, *inter alia*, Leahy v. Mid-West Conveyor Company, Inc., 120 A.D.2d 16 ($3^d$ Dep't 1986) and N.Y.U.C.C. § 2-316, comment 9; Def. Reply Mem. L. p. 1 (citing, *inter alia*, N.Y.U.C.C. § 2-315 & comment 9 to N.Y.U.C.C. § 2-316; Paul T. Freund Corp. v. Commonwealth Packing Co., 288 F. Supp. 2d 357, 371 (W.D.N.Y. 2003)).

Plaintiffs counter that Felchar did rely on BCL's skill and judgment in filing the order. In this regard, Felchar contends that by specifying that the laminations had to have a peak permeability of 1200 but not specifying the type of steel to be used to achieve this result, Felchar relied on BCL to select the appropriate steel to meet the specification.

8

While it is not entirely clear what implied warranty was purportedly breached in this case - the warranty of merchantability or the warranty of fitness for a particular purpose,[7] there is sufficient evidence in the record to allow Plaintiffs' breach of implied warranty claim to go forward. First, by Defendant's own argument, see fn. 2, *supra*, there is a material question of fact whether Felchar gave BCL "detailed specifications" regarding the goods it was purchasing. If the requirement of peak permeability of 1200 was not a recognized specification within the industry, then it appears doubtful that the purchase order demanded the production of a laminations with such specificity that there was no room for BCL to exercise independent judgment.

Accepting that the peak permeability requirement of 1200 was a specification of the order, a reasonable fact finder could conclude that numerous other unspecified factors, including silicon content in the steel and the manufacturing process itself, affected the electromagnetic properties of the laminations that were eventually produced. At a minimum, a genuine question of material fact exists as to whether Flechar relied upon BCL to select the appropriate steel to satisfy Felchar's requirement that the rotor laminations meet the listed value for peak permeability of 1200. A reasonable fact finder could conclude that this reliance arose both from the prior dealings between

---

[7] The Complaint alleges that BCL breached "its implied warranty of merchantability," Compl. ¶ 40, but in opposition to the present motion Plaintiffs argue:

> An implied warranty of fitness for a particular purpose arises when "the seller at the time of contracting has reason to know any particular purpose for which services are required that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." N.Y. U.C.C. § 2-315. Reliance, however, is generally a fact question inappropriate for resolution on summary judgment. See N.Y.U.C.C. §§ 2-315, Comment 1 ("Whether or not this warranty arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting.").

Pl. Mem. L. p. 10 (emphasis added). Plaintiffs and Defendant both point to N.Y. U.C.C. § 2-315 (addressing an implied warranty of fitness for a particular purpose) as opposed to N.Y.U.C.C. § 2-314 (addressing an implied warranty of merchantability) in support of their respective arguments. While this issue will have to be cleared up before trial, the motion can go forward because, even under Defendant's view of the applicable law, there is a genuine question of material fact making summary judgment inappropriate on this claim. See text, *infra*.

the two companies, and from the fact that BCL held itself out as "the best supplier of laminations in the marketplace" that had, as a "business strategy," a goal to "fulfill [its] customers' implied, as well as stated needs." Socolow Decl., ex. 1.  Accordingly, the motion is denied on this ground.

### B. Breach of Express Warranty

Plaintiffs also assert that "[a]t the time of the sale of the Rotor Laminations, BCL expressly warranted and represented that the Rotor Laminations were merchantable and fit for the purpose for which they were intended – as a component of the motor in Shop Vac's vacuum cleaner products, a purpose known to BCL." Compl. § 27.  Defendant contends that this breach of express warranty claim must be dismissed because (1) the purchase order, which contains an integration clause, was the contract, (2) the purchase order contains no express warranties, and (3) New York's parole evidence rule precludes the introduction of evidence that contradicts, varies, or negates any clause in a written contract.  Plaintiffs counter that the purchase order was not the entire contract, but rather only part of the agreement formed by an exchange of multiple documents, including the part print.

It is unclear whether the purchase order constitutes the entire contract.  The purchase order is not signed by anyone from BCL, and, other than the reference to the part print, provides little detail as to the specifications of the rotor laminations Felchar sought to purchase. See Def. Reply Mem. L. pp. 1, 3.[8]  "When a contract refers to specifications, it can be inferred that the contract is not 'the entire agreement of the parties' and, therefore, proof of an oral express warranty of compatibility is not barred by an integration clause nor by a disclaimer of 'warranties, express or implied.'" 2 ANDERSON ON THE UNIFORM COMMERCIAL CODE ("2 ANDERSON UCC")§ 2-202:145

---

[8] Defendant argues in its Reply Memorandum of Law that "[t]he purchase order specifically states that the rotor laminations are to be manufactured pursuant to part print #12637-11, Revision Code V." Def. Reply Mem L. p. 1. Defendant further contends that the specifications in the part print are incorporated in the purchase order. Id. at p. 3.

10

(2005)(quoting Word Management Corp. v. AT & T Information Systems, Inc., 135 A.D.2d 317, 320 (3rd Dep't 1988)).  When there is ambiguity as to what constitutes the full contract, neither an integration clause or the parole evidence rule prohibits the introduction of parol evidence. See 2 ANDERSON UCC § 2-202:140 ("When a writing is obviously not the complete contract of the parties, neither the merger clause of the contract nor the parol evidence rule prohibits the introduction of parol evidence to establish the full contract of the parties.")((citing Word Management Corp., 135 A.D.2d 317); 2 ANDERSON UCC § 2-202:54 ("The fact that a writing contains an integration clause stating that it is the entire contract does not bar parol evidence as to an oral condition precedent because the integration clause has no significance until it is determined that there is a contract of which the integration clause is a part.")(citing Tropical Leasing, Inc. v. Fiermonte Chevrolet, Inc., 80 A.D.2d 467 (4th Dep't 1981)); see also 2 ANDERSON UCC § 2-202:141 ("When the parties did not regard their purchase order as the final expression of their agreement, parol evidence was admissible to establish what that agreement was.").  This is especially true when the integration clause is contained in a form document more akin to a sales receipt then a contract. See 2 ANDERSON UCC § 2-202:54.[9]

     Even assuming that the purchase order was the entire agreement, Plaintiff may establish a viable breach of express warranty claim based upon the terms of the contract. See Rogath v. Siebenmann, 129 F.3d 261, 264 (2d Cir. 1997)(Under New York law, breach of an express warranty is proven by showing the existence of an express warranty, reliance on that warranty as part of the

---

[9] "Since an integration clause is often included in the modern, whether standardized or not, contract as a matter of routine, its presence does not necessarily establish that the parties, in fact, intended that the writing be the complete statement of their agreement. In other words, the fact that a contract contains a clause stating that it contains the entire contract and that no representation not set forth has been made, does not bar a finding that the writing was not intended as the complete and exclusive statement of the terms of the parties' agreement." 2 ANDERSON UCC § 2-202:54 (citations omitted).

11

agreement between the parties, and that the warranty was false or misleading when made, proximately causing plaintiff's loss.). "It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty." N.Y.U.C.C. § 2-313(2). "Any description of the goods which is made part of the basis of the bargain creates an express warranty [by the seller] that the goods shall conform to the description." N.Y.U.C.C. § 2-313(1)(b). As indicated above, the purchase order references the part print. "A description need not be by words. Technical specifications, blueprints and the like can afford more exact description than mere language and if made part of the basis of the bargain goods must conform with them." Comment 5 to N.Y.U.C.C. § 2-313.

Accepting for this motion that (1) the part print required a peak permeability of 1200, (2) that this requirement was recognized as a specification within the industry or by the prior dealings of the parties, see Comment 5 to N.Y.U.C.C. § 2-313;[10] and (3) that the part print specifications were incorporated by reference in the purchase order, See fn. 8, *supra*, the integration clause would not bar the breach of express warranty claim because the express warranty would arise *from* the terms of the contract, not from the parties' discussions.  Thus, if the laminations produced by BCL did not meet the requirements of the part print or were not suitable for use in Felchar's K frame motors, a reasonable fact finder could conclude that Defendant breached the express warranty, contained in the contract, that it would produce rotor laminations that had a peak permeability of 1200. Summary judgment is, therefore, denied on this claim.

---

[10] Comment 5 states, in part: "Past deliveries may set the description of quality, either expressly or impliedly by course of dealing.  Of course, all descriptions by merchants must be read against the applicable trade usages with the general rules as to merchantability resolving any doubts."

### C. Negligence Claim

Plaintiffs also assert that BCL was negligent in manufacturing the rotor laminations, and that this negligence caused Plaintiffs to sustain certain damages. See Compl. ¶¶ 32-36. Defendant argues that the claim must be dismissed because, under New York law: 1) a negligence claim does not arise from a breach of contract; 2) a claim seeking only economic damages precludes a negligence claim; and 3) an injury directly related to non-performance of the product limits the plaintiff to contractual remedies. The Court agrees.

"It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389 (1987)(collecting cases). "This doctrine, known as the economic loss rule, holds that 'a negligence action seeking recovery for economic loss will not lie.'" Green Hills (USA), L.L.C. v. Aaron Streit, Inc., 361 F. Supp. 2d 81, 89 (E.D.N.Y. 2005)(quoting County of Suffolk v. Long Island Lighting Co., 728 F.2d 52, 62 (2d Cir. 1984)). While exceptions to this rule exist for claims sounding in professional malpractice, Sommer v. Federal Signal Corp., 79 N.Y.2d 540, 550-52 (1992); Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 17 (2d Cir. 2000), or negligent performance of contractual services, MCI Telecom. Corp. v. John Mezzalingua Assoc., Inc., 921 F. Supp. 936, 945 (N.D.N.Y. 1996)(Scullin, J.), Plaintiffs do not assert a claim falling into these exceptions. The interaction between Felchar and BCL was in the nature of a commercial contract for the purchase a specific product. It was a contractual relationship governed by the UCC, not in the nature seeking services or professional advice. See Word Management Corp., 135 A.D.2d at 321 ("[I]f the transaction is deemed to be a sale of goods, and thus falls within UCC article 2, plaintiff is limited to its contractual remedies and may not maintain

13

the traditional tort causes of action of negligence or strict products liability.")(citing Schiavone Constr. Co. v. Mayo Corp., 56 N.Y.2d 667 (1982)). The asserted damages are wholly economic in nature and arise because of the purported failure of the laminations. Plaintiffs have not alleged or proffered facts that would demonstrate that Defendant engaged in tortious conduct separate and apart from the alleged failure to fulfill contractual obligations. Accordingly, no tort claim lies in this case. See Bocre Leasing Corp. v. General Motors Corp., 84 N.Y.2d 685, 694 (1995)("Tort recovery in strict products liability and negligence against a manufacturer should not be available to a down-stream purchaser where the claimed losses flow from damage to the property that is the subject of the contract.... Tort law should not be bent so far out of its traditional progressive path and discipline by allowing tort lawsuits where the claims at issue are, fundamentally and in all relevant respects, essentially contractual, product-failure controversies."); Gordon v. Teramo & Company, Inc., 308 A.D.2d 432, 433 (2d Dep't 2003); Zulinski v. Merkley Bros., Inc., 247 A.D.2d 613, 614 (2d Dep't 1998).

### D.  Breach of Contract

Defendant also contends that Plaintiffs' breach of contract claim should be dismissed because Plaintiffs cannot demonstrate that the alleged breach - BCL's failure to meet Felchar's peak permeability requirement of 1200 - caused Plaintiffs to suffer damages. In this regard, Defendant cites to portions of the deposition transcript of Plaintiffs' expert, Dr. Habetler, that appear to indicate that Dr. Habetler is of the opinion that the motors failed because of excessive heat; that the excessive heat was caused by "high core losses" in the rotors; that BCL met Felchar's core loss specification; and that core losses are not created by permeability. See Def. Mem. L. p. 11 (citing Habetler Dep.). Plaintiffs counter that Defendants have misconstrued Dr. Habetler's testimony; that

14

Dr. Habetler has opined that BCL's failure to meet Felchar's peak permeability requirement was a direct cause of the motors overheating, see Habetler Dec. ¶ 3; and that, in addition to Dr. Habetler's testimony, Plaintiffs will establish causation through the testimony of other expert witnesses and by circumstantial evidence.

"In both tort and contract law, causation is an essential element of damages and a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages." Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 2005 WL 832050, at *4  (S.D.N.Y. 2005)(applying New York law, citations omitted).  Where different reasonable and legally sufficient inferences of proximate cause are possible, the question is for the jury. Grover v. Town of Montour, 252 A.D.2d 859, 860 (3rd Dep't 1998); Ross v. Ching, 146 A.D.2d 55, 58-59 (4th Dep't 1989).  While the cited parts of Dr. Habetler's deposition appear to add up to the conclusion that Defendant proffers, the contrary (and direct) statement by Dr. Habetler at paragraph 3 of his declaration is, itself, a sufficient basis to deny this portion of the motion.  Further, the Court does not have before it the testimony or reports of the Plaintiffs' other experts, and the Court cannot say, as a matter of law, that a reasonable fact finder could not find causation based upon this evidence, or the circumstantial evidence that Plaintiff alludes to. See Allegheny Energy, Inc., 2005 WL 832050, at * 5 ("Allegheny claims that its expert is not the exclusive source of its evidence to show proximate cause and that Allegheny's senior managers who negotiated the Purchase Agreement will provide testimony that shows the requisite causal nexus between breach or harm and damages. This meets the threshold of a triable issue of fact to defeat a grant of summary judgment, but only just."). Defendant has failed to establish its entitlement to summary judgment on this basis, and, therefore, the motion is denied on this ground.

15

**E. Specific Damages**

Finally, Defendant contends that Plaintiff should be precluded from seeking three categories of damages because these sought-after damages are either too speculative, or because there is no proof that the damages were caused by Defendant's conduct. In this regard, Defendant asserts:

> It is BCL's position that the plaintiffs have failed to set forth sufficient proof to maintain, at least, two of their listed line items of damages; "Loss on handling/warehouse deductions by Lowe's" and "Estimated Damages From Future Returns". [] It is also BCL's position that plaintiffs' line item of damage entitled "loss of revenue on discontinued models" should be dismissed as that "damage" was not caused by the alleged breach of contract.

Def. Mem. L. pp. 17-18. Plaintiffs counter that they will be able to establish their entitlement to each of the challenged category of damages. See Pl. Mem. L. pp. 22-25.

When examined closely, Defendant's arguments on the "Loss on handling/warehouse deductions by Lowe's" and "Estimated Damages From Future Returns" categories are that it disagrees with Plaintiffs' calculations, and/or believes that the Plaintiff will be unable to meet its burden of establishing such damages at trial. See Def. Reply Mem. L. pp. 8-9.[11]   Of course, on a

---

[11]  On the "Loss on Handling/Warehouse Deductions by Lowe's," Defendant argues:

> The plaintiffs state that it is undisputed that Lowe's charged Shop Vac for returning recalled vacuum cleaners and that such costs are reflected in debit memos that Lowe's issued to Shop Vac. That is not accurate. There has been no witness, no expert witness, no evidence of any kind that support Shop Vac's position that the "adders" charged by Lowe's was fair and reasonable and/or causally related to this recall. The plaintiffs argue that the debit memos issued by Lowe's are business records and therefore entitled to the exception from the hearsay rules pursuant to FRE §803(6). However ... [t]he plaintiffs have not identified any witness from Lowe's, or any other witness, that it expects to call to lay such a foundation for the debit memos.

Def. Reply Mem. L. p. 8.

On the "Future Returns," Defendant argues:

> The plaintiffs spent some time arguing that BCL has used an incorrect number of unaccounted for vacuums in its calculations. Whether that is true or not can be left for trial but their argument misses the point that the plaintiffs have failed to come forward with any basis of their claimed future vacuum return rate range of "75% to 90%." [One of Plaintiffs' witnesses Roger] Arrington testified that that

(continued...)

16

motion for summary judgment, the Court must draw reasonable inferences in favor of the non-movant and may dismiss a claim for damages (or certain categories of damages) only where it is legally certain that the non-movant cannot prevail on such a claim. While Plaintiffs must provide some basis upon which a reasonable fact finder could award it damages in each of the challenged categories, see Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 332 (2d Cir. 1993), and while Plaintiffs' damages claims may be rejected by the jury (or even the Court on a FED. R. CIV. P. 50 motion), Plaintiff has met its burden at this stage of the proceedings. See Allegheny Energy, Inc., 2005 WL 832050, at * 5   (difficulty of calculating damages does not preclude recovery; finding that whether damages are too speculative to prevail presents triable issue of fact).

On the "loss of revenue on discontinued models" claim, it appears that at approximately the time that Plaintiffs' determined to recall its "K frame" vacuum cleaners with BCL rotor laminations, Lowe's determined to discontinue selling 16-gallon Shop Vac vacuum cleaners and instead sell 18-gallon Shop Vac vacuum cleaners. After the recall, Lowe's agreed to "re-purchase" 18-gallon Shop Vac vacuum cleaners, but only for the price applicable to the similar 16-gallon Shop Vac vacuum cleaners that had been recalled. Plaintiffs' damage claim for "loss of revenue on discontinued models" (in the amount of approximately $74,000.00) reflects the difference between the prices of the two models and the revenue Plaintiffs lost for each resold unit. See Pl. Ex. 25; Pl. St. ¶ 119.

If the evidence establishes that Lowe's had already purchased the recalled 16-gallon Shop

---

[11](...continued)
range was based upon a discussion with a group of managers, but none has been identified to give opinion evidence nor have the plaintiffs identified any expert to testify to the future return range. There has been no evidence produced to support a future return range of "75% to 90%."

Def. Reply Mem. p. 9.

17

Vac vacuum cleaners and would have sold them but for the recall, then Plaintiff may seek damages for lost revenue. Indeed, a jury may well conclude that, but for BCL's conduct, the sale of the recalled 16-gallon Shop Vac vacuum cleaners would have been a completed transaction - the classic "done deal." Put another way, Plaintiffs may be able to establish that, but for the recall, they would not have incurred an additional $74,000.00 in costs in order to sell the "recalled" vacuum cleaners to Lowe's. While there may be numerous factual permutations that could defeat this damage claim at trial, it will not be dismissed on summary judgment.

## VI. CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is **GRANTED IN PART and DENIED IN PART**. The motion is granted inasmuch as it seeks to dismiss any claim sounding in common law negligence, and any such claim is **DISMISSED**. The motion is denied in all other respects.

**IT IS SO ORDERED**

DATED: October 24, 2005

*Thomas J. McAvoy*
Thomas J. McAvoy
Senior, U.S. District Judge